Timothy D. HAMMERMEISTER,
Debtor.

Dorothy Hammermeister, Plaintiff,

v.

Timothy D. Hammermeister,
Defendant.

Bankruptcy No. 00–36167.
Adversary No. 01–3013.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Dec. 17, 2001.

Roger E. Luring, Troy, OH, for Plaintiff.

Donald F. Harker, III, Dayton, OH, for Defendant.

Townsend Foster, Jr., Troy, OH, Chapter 7 Trustee.

### *MEMORANDUM OPINION*

JOHN E. HOFFMAN, Jr., Bankruptcy Judge.

Dorothy Hammermeister ("Dorothy"), former wife of the debtor, Timothy Ham-

mermeister (the "Debtor"), has filed a complaint to determine the dischargeability of the Debtor's obligation to pay one-half of Dorothy's $400 monthly mortgage payment (the "Mortgage Obligation"). Dorothy seeks a determination that the Mortgage Obligation, which was imposed by a state court divorce decree (the "Divorce Decree"), is nondischargeable under 11 U.S.C. § 523(a)(5) and (a)(15).

The following issues are before the Court: (1) whether the Mortgage Obligation constitutes a debt for alimony, maintenance, or support, which is excepted from discharge by 11 U.S.C. § 523(a)(5); and (2) whether the Mortgage Obligation is nondischargeable under 11 U.S.C. § 523(a)(15), which requires the Court to determine: (a) if the Debtor has the ability to pay the Mortgage Obligation from income or property not expended for his maintenance or support or that of his dependents; or (b) if the discharge of the Mortgage Obligation would result in a benefit to the Debtor that outweighs the detrimental consequences to Dorothy.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052).

## I. *Jurisdiction*

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. *Factual and Procedural Background*

### A. *The Divorce Proceeding*

The Debtor and Dorothy were married in 1977. They have two children, Lukas, age 20, and Ann, age 15.

In 1993 or 1994, the Hammermeisters borrowed $30,000 (the "Loan") from Society Bank ("Society"). To secure repayment of the Loan, Society took a mortgage on the Hammermeisters' real estate, consisting of their residence and ten acres of land (the "Property"). Before the Hammermeisters obtained the Loan from Society, the Property was unencumbered. The proceeds from the Loan were used to make home repairs, purchase a 1992 Chevrolet Lumina (the "Lumina"), pay for their son's orthodontia, and pay miscellaneous household expenses. Until 1999, the $400 monthly Loan payments were paid from the combined income of the Hammermeisters.

In October 1999, Dorothy filed a complaint for divorce against the Debtor in the Miami County Court of Common Pleas (the "State Court"). A decision was rendered by the State Court magistrate (the "Magistrate's Decision") in the divorce proceeding on May 30, 2000. Paragraphs F and G of the Magistrate's Decision provide that:

F. The parties are equally liable for the mortgage debt on the marital residence. [Debtor] shall pay directly to Dorothy his one half payment of the mortgage by the first day of each month. After [Debtor] has paid his one-half total share of the mortgage (including interest) Dorothy shall refinance the debt within 3 months thereafter, so as to get [Debtor's] name off any remaining mortgage.

G. Each party shall hold the other harmless on their share of this debt. It is not practical, reasonable or appropriate to sell the house at this time as it provides shelter for Dorothy and the minor child at a very reasonable rate. To sell the house to pay this debt would very likely increase Dorothy's need for spousal support and make any deviation in

child support less appropriate. Accordingly, considering the facts in this case and the case law and statutory law, it would not be appropriate in this case to sell the marital residence to pay of [sic] the mortgage merely to disentangle these parties at the end of their marriage.

Magistrate's Decision, Joint Exhibit I, at 5.

The Magistrate's Decision also contains a lengthy explanation of spousal support under Ohio law, including a discussion of what constitutes support, who is entitled to support and in what measure, and the factors to be evaluated by a domestic relations court in awarding spousal support. After considering these factors, the Magistrate found that:

*Dorothy is not entitled to spousal support when taking into consideration all of the factors for spousal support as set forth in the conclusions of law section of this decision.* The Court will retain jurisdiction over the issue of spousal support should there be a change in the parties' circumstances. The court shall not retain jurisdiction in excess of six (6) years from the filing of divorce. *Further should the court award any spousal support during the six (6) year period it shall be terminal [sic] upon the death of either party, remarriage of Dorothy or cohabitation of Dorothy with an adult male in a marriage-type relationship.*

*Id.* at 13 (emphasis added).

On September 5, 2000, the Divorce Decree was entered by the State Court. The Divorce Decree specifically notes that no objections had been made to any portion of the Magistrate's Decision, which is incorporated in its entirety in the Divorce Decree.

The Debtor last made a payment on the Mortgage Obligation in August 1999. Dorothy has made all of the payments since then. On November 21, 2000, slightly over two months after the entry of the Divorce Decree, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Dorothy timely filed her complaint to determine the dischargeability of the Mortgage Obligation.

### B. *The Debtor's Financial Condition*

The Debtor is forty-three years old. He graduated from high school, but has no additional formal education. He has been a union carpenter since 1980. The Debtor's employment over the past several years has followed a pattern of seasonal work, with eight or nine months of work during good weather followed by three or four months of unemployment every winter. He earns either $18.95 per hour or $21.05 per hour, depending on whether a job involves more than 50,000 square feet and whether it is government funded. His income, including wages and unemployment benefits, has been in the $30,000 to $40,000 range over the past several years. His 1999 Form 1040 income tax return states adjusted gross income of $35,174, while the adjusted gross income reported on his 2000 Form 1040 income tax return is $31,353. The Debtor's Statement of Financial Affairs lists income of $37,800 in both 1998 and 1999. The Debtor qualified for an earned income tax credit in 1997 and again in 2000.

The Debtor has a number of medical problems, including a back injury for which he has undergone surgery, as well as asthma and allergies that require regular prescription medication. Nevertheless, he has worked steadily since 1980.

On Schedules I and J,[1] the Debtor lists expenses of $2,684 per month and an aver-

---

1. For purposes of trial and at the direction of the Court, both parties prepared a Schedule

age monthly income of $2,343. His itemized breakdown of monthly expenses includes the following items:

| | |
|---|---|
| Rent | $600 |
| Utilities | $300 |
| Telephone | $ 60 |
| Food | $350 |
| Clothing | $ 50 |
| Laundry & Dry Cleaning | $ 50 |
| Medical & Dental Expenses | $100 |
| Transportation Expenses | $350 |
| Recreation | $100 |
| Health Insurance | $230 |
| Automobile Insurance | $ 60 |
| Child Support | $384 |
| Contribution to Son's College Expenses | $ 50 |

The Debtor rents a furnished, three-bedroom house in West Milton, Ohio. The Debtor has minimal furnishings of his own. His landlord supplies dishes and silverware. The Debtor testified that at the time he was looking for a house to rent, very little was available in West Milton. He also testified that his $600 per month payment constitutes reasonable rent for a furnished, three-bedroom house in West Milton. According to the Debtor, a three-bedroom house is required to provide space for his children when they visit. Ann stays with him three weekends a month and every Wednesday night. Lukas visits occasionally.

The Debtor drives the Lumina, which was purchased with a portion of the Loan proceeds. In his schedules, the Debtor valued the Lumina, which has over 174,000 miles on its odometer, at $1500. In addition to the Lumina, the Divorce Decree awarded the Debtor a 1992 Ford Explorer and a 1986 truck. The Debtor testified that he surrendered the Ford Explorer to the St. Luke Parish Federal Credit Union and gave the truck away because it was not drivable. The Magistrate's Decision also references a 1990 Chevrolet that was to be transferred to Lukas; no explanation of the 1990 Chevrolet's whereabouts was provided at trial, and no mention of this vehicle was made in the Divorce Decree.

The aggregate value of the Debtor's personal property listed on Schedule B is $2400. The Debtor's personal property consists of the Lumina, a checking account with a balance of $100, household goods valued at $200, wearing apparel valued at $100, and carpentry tools valued at $500. The Debtor has $47,450 in retirement benefits, although this asset was not listed on his Schedule B. The Divorce Decree provides that Dorothy's 401(k) plan, having a value of approximately $4500, was to be divided equally between the parties effective April 10, 2000, by way of a Qualified Domestic Relations Order ("QDRO"). Likewise, the Debtor's SWODCC Pension Plan (the "Union Pension") is subject to a QDRO and, under the Divorce Decree, was to be divided equally between the parties effective April 10, 2000. The value of the Union Pension plan as of December 31, 1999 was $90,755.86.

The Divorce Decree required the Debtor to pay credit card debts totaling approximately $3300.

The Debtor discharged approximately $15,000 of unsecured debt in his Chapter 7 case. He testified that he has the following postpetition obligations: $1200 for back rent owed to his landlord, approximately $500 owed to Dayton Power & Light for utility bills, and $192 owed for car repairs.

### C. Dorothy's Financial Condition

Dorothy is forty-five years old. She has worked nights as a cargo handler for Em-

B—Personal Property, Schedule I—Current Income of Individual Debtor(s), and Schedule J—Current Expenditures of Individual Debtor(s), using the official bankruptcy forms. In addition, Dorothy prepared a Schedule A—

Real Property. Unless otherwise noted, all references to Schedules A, B, I, and J mean the schedules prepared for use at trial and not the original schedules filed by the Debtor with his petition.

ery Air Freight ("Emery") for the past five and one-half years. Dorothy specifically chose the night shift in order to be at home during the day to care for her children. She works twenty-five hours a week, but has requested an increase to thirty hours. While she is at work, her parents stay with Ann. Lukas attends Hocking Technical College and lives away during the school year. He lives with Dorothy while home on breaks. Dorothy makes $16.85 an hour at Emery. Her total monthly take-home pay is $1021.88. In addition, she receives a monthly child support payment of $358.94 from the Debtor. Thus, her total monthly income is $1,380.82.

Dorothy received income tax refunds of $3032 for the 2000 tax year (after receiving an earned income credit) and $185 for the 1999 tax year.

Although Dorothy recently was involved in an automobile accident caused by an intoxicated driver, which resulted in a seven-week absence from work, she is in good health. At the time of the trial, she had in excess of $4,000 in medical bills resulting from the accident. Dorothy testified that both the intoxicated driver and the driver of the car in which she was a passenger are insured, but that she has not yet consulted with the insurance carriers or an attorney regarding payment of her medical bills.

On Schedules I and J, Dorothy lists monthly expenses of $2,864, which include the following:

| | |
|---|---|
| Share of Mortgage Payment | $200 |
| Utilities | $226 |
| Water Softener & Pump Repairs | $ 70 |
| Home Maintenance | $200 |
| Food | $500 |
| Clothing | $100 |
| Laundry & Dry Cleaning | $235 |
| Medical & Dental Expenses | $300 |
| Transportation Expenses | $100 |
| Homeowner's Insurance | $ 40 |
| Automobile Insurance | $165 |
| Real Estate Taxes | $125 |
| Lukas's College Expenses | $322 |
| Lease Payment—Truck Driven by Lukas | $281 |

Dorothy is Ann's custodial parent. She also is providing most of Lukas's support. Dorothy testified that, in addition to making payments on the lease of the truck that Lukas drives (the "Truck Lease"), she assists him in paying for college housing, books, food, medicine, and haircuts. She took a loan from her 401(k) plan to pay for Lukas's college housing. The Debtor testified that he helps Lukas with groceries and gas money—providing him about $50 per month—but conceded that Dorothy is paying a much greater share of their son's expenses.

On her Schedule B, Dorothy values her personal property at $7,800. These assets include a checking account with a $200 average balance; $2000 in household goods and furnishings; $500 in books, pictures, etc.; $500 in wearing apparel; $100 in furs and jewelry; and a one-half interest in both the Union Pension and her Emery 401(k) plan, for an estimated total of $4500 in retirement benefits. The amount of retirement benefits listed by Dorothy appears to be incorrect, since the Divorce Decree lists the undivided value of the Union Pension as in excess of $90,000, and the undivided value of her 401(k) plan as $4,500. Dorothy does not own a vehicle; she uses an automobile provided by her parents. In addition, Dorothy owns the Property, which is valued at $92,000 and encumbered by Society's mortgage in the approximate amount of $29,000. Because it was her grandfather's farm, Dorothy testified that she has not considered selling or subdividing the Property.

The Divorce Decree requires Dorothy to pay a debt to Sears in the amount of $1400. Her other liabilities are the Truck Lease, the Mortgage Obligation, and her medical bills.

### III. Arguments of the Parties

Dorothy asserts that the Debtor's obligation to pay the Mortgage Obligation is nondischargeable on either of two grounds.

First, despite the finding in the Magistrate's Decision (which was incorporated in the Divorce Decree) that she was not entitled to spousal support, Dorothy argues that the Court should find that the Mortgage Obligation is in the nature of alimony, maintenance, or support and thus nondischargeable under 11 U.S.C. § 523(a)(5). According to Dorothy, the Divorce Decree was structured to permit her and the children to remain in the Property, and to do so in a manner that offered Dorothy tax advantages. Hence, she contends that the Mortgage Obligation is, in effect, a support payment. Second, Dorothy argues that the Mortgage Obligation is nondischargeable under § 523(a)(15) of the Bankruptcy Code because: (1) the Debtor has the ability to pay the Mortgage Obligation from income or property not necessary for his maintenance or support; and (2) discharging the Mortgage Obligation will not result in a benefit to the Debtor that outweighs the detriment to Dorothy. *See* 11 U.S.C. § 523(a)(15).

According to the Debtor, the State Court's finding that Dorothy was not entitled to alimony, maintenance, or support establishes that the Mortgage Obligation is simply a dischargeable division of debt. The Debtor maintains that he does not have sufficient income or property, after payment of his necessary living expenses, to pay the Mortgage Obligation. To require him to do so, the Debtor argues, would result in a detriment to him that would outweigh any benefit to Dorothy. The Debtor therefore asserts that the Mortgage Obligation is not excepted from discharge under either § 523(a)(5) or § 523(a)(15) of the Bankruptcy Code.

### IV. *Legal Analysis*

#### A. *Section 523(a)(5)—Dischargeability of Alimony, Maintenance, or Support Obligations*

Section 523(a)(5) of the Bankruptcy Code provides in pertinent part that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

. . . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record . . ., but not to the extent that –

. . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

11 U.S.C. § 523(a)(5).

In *Long v. Calhoun (In re Calhoun),* 715 F.2d 1103 (6th Cir.1983), the Sixth Circuit provided an analytical framework for determining whether an obligation "is actually in the nature of alimony, maintenance, or support," even though it is not so designated. *Calhoun* involved an obligation imposed in a separation agreement under which the debtor agreed to assume five joint marital obligations and hold his ex-spouse harmless on the debts. *Id.* at 1105. The Sixth Circuit set forth a four-part test for determining whether an obligation not denominated as alimony or maintenance was actually in the nature of support and thus nondischargeable:

First, the obligation constitutes support only if the state court or parties intended to create a support obligation. Second, the obligation must have the actual effect of providing necessary support. Third, if the first two conditions are satisfied, the court must determine if the obligation is so excessive as to be unrea-

sonable under traditional concepts of support. Fourth, if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law.

*Fitzgerald v. Fitzgerald (In re Fitzgerald),* 9 F.3d 517, 520 (6th Cir.1993) (citing *Calhoun,* 715 F.2d at 1109–10). The *Calhoun* court imposed the burden of establishing that an obligation is in the nature of support on the non-debtor. *Calhoun,* 715 F.2d at 1111.

■ In *Fitzgerald,* the Sixth Circuit addressed a fact pattern that was the converse of the situation presented in *Calhoun* (where the non-debtor spouse contended that an obligation not labeled as support really was support). Asserting that his ex-wife, who had become self-supporting, did not presently need the $1,500 monthly payments he had been making under an agreement incorporated into a state court divorce decree, the debtor-spouse in *Fitzgerald* maintained that an obligation denominated as alimony actually was not in the nature of support. *Fitzgerald,* 9 F.3d at 521. The *Fitzgerald* court began its analysis by expressing the view that *Calhoun* had been too expansively applied by bankruptcy courts. *Id.* at 520. Noting that *Calhoun's* "present needs" test had been criticized as "undue federal interference with state court domestic authority," the court explained that the *Calhoun* decision was "not intended to intrude into the states' traditional authority over domestic relations . . . ." *Id.* at 520–21. Because the monthly payments in question bore at least two earmarks of a traditional alimony award—(1) they were intended to permit the non-debtor spouse to achieve a standard of living compatible with what she might expect were the marriage to continue; and (2) they terminated upon remarriage—the Sixth Circuit held that the payments were

nondischargeable under § 523(a)(5). *Id.* at 521. *Fitzgerald* thus stands for the proposition that a state court's alimony award is entitled to deference when the obligation is clearly so designated and structured. *See Sorah v. Sorah (In re Sorah),* 163 F.3d 397, 401 (6th Cir.1998).

■ In *Sorah,* the Sixth Circuit again considered the dischargeability of marital obligations, this time in the context of a case in which the debtor-spouse's monetary obligation was labeled "monthly maintenance." *Sorah,* 163 F.3d at 401. Despite this label, the debtor-spouse asserted—and the bankruptcy court found—that the $750 monthly payments were actually a disguised property distribution. *Id.* at 400. The Sixth Circuit reversed the bankruptcy court, holding that the monthly maintenance award was nondischargeable under § 523(a)(5). *Id.* at 403. Citing the adage "that if something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck," the Sixth Circuit directed bankruptcy courts in determining whether an award is actually support to "first consider whether it 'quacks' like support." *Id.* at 401. The court reasoned:

> [T]he [bankruptcy] court should look to the traditional state law indicia that are consistent with a support obligation. These include, but are not necessarily limited to, (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage or eligibility for Social Security benefits.
>
> An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be

conclusively presumed to be a support obligation by the bankruptcy court. A non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523 and is thus nondischargeable. *Id.* at 401.

The Sixth Circuit in *Sorah* again directed bankruptcy courts to accord appropriate deference to a state court's decree in determining the dischargeability of a marital obligation under § 523(a)(5). Noting that "the bankruptcy court does not sit as a super-divorce court," the *Sorah* court admonished bankruptcy judges "not . . . to assume the role of psychological examiner, probing the state court's decision for linguistic evidence of ulterior motives." *Id.* at 402.

Dorothy relies on *Sorah* and *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901 (6th Cir. BAP 2000) to support her contention that the Mortgage Obligation—although not labeled as alimony, maintenance, or support in the Divorce Decree—is in the nature of support and thus nondischargeable under § 523(a)(5). *Bailey* involved a state court divorce decree that required the debtor-spouse to assume mortgage and credit card debts, and ordered the parties to sell certain personal property with the proceeds to be used for the care and maintenance of the debtor's wife and children. 254 B.R. at 903–04. The bankruptcy court had entered an order holding the debts nondischargeable and ordering the sale of the personal property. On appeal, the debtor argued that the obligations were not in the nature of support. *Id.* The Sixth Circuit Bankruptcy Appellate Panel (the "BAP") affirmed the bankruptcy court. The BAP noted that the state court had repeatedly labeled the award as maintenance, support, and alimony. *Id.* at 905.

The BAP also pointed out that the state court had found a disparity in income between the parties, that the debtor's wife was unable to obtain a higher-paying job due to her obligation to care for their children, one of whom was disabled, and that she would have to pay the mortgage and credit card debts absent the debtor's assumption of those debts, thereby adversely affecting her ability to support herself and the children. *Id.* Upon consideration of the traditional state law indicia of support identified by the Sixth Circuit in *Sorah,* the BAP concluded that the bankruptcy court had correctly determined the debtor's obligation to be nondischargeable support.

Dorothy's reliance on *Sorah* and *Bailey* is misplaced. Both of these decisions direct bankruptcy courts not to look behind awards designated as alimony or support if the award manifests the traditional indicia of a support obligation. Here, Dorothy asks the Court to ignore that directive and look behind the Magistrate's Decision, although it expressly states that "Dorothy is not entitled to spousal support when taking into consideration all of the factors for spousal support set forth in the conclusions of law section of this decision[.]" Notwithstanding this plain language, Dorothy seeks a determination that the Mortgage Obligation constitutes nondischargeable support. She argues that the Mortgage Obligation bears certain indicia of support: it is a direct payment to a former spouse that enables Dorothy and her children to remain in the house. She also asserts that the Mortgage Obligation was purposely not labeled as alimony or spousal support so that she would not have to report the payments to be received from the Debtor as taxable income. Neither of these arguments is persuasive.

The three traditional indicia of a support obligation identified by the Sixth Circuit in *Sorah* are: (1) a label such as alimony, support, or maintenance in the decree or agreement; (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt; and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits. Here, the Mortgage Obligation is a direct payment to a former spouse rather than an assumption of a third-party debt. But two of the three traditional indicia of a support obligation are not present: the Mortgage Obligation is neither labeled alimony, support, or maintenance in the Divorce Decree nor contingent upon Dorothy's death, remarriage, or eligibility for Social Security benefits. The absence of these traditional hallmarks of support identified in *Sorah* belies Dorothy's contention that the Mortgage Obligation is in reality a disguised spousal support payment.

*Sorah* specifically states, however, that when a court determines whether an award constitutes support, it need not limit its analysis to consideration of the three traditional indicia, but also may look to other factors. *Sorah*, 163 F.3d at 401.

Other indicia of a support obligation include: (1) the disparity of earning power between the parties; (2) the need for economic support and stability; (3) the presence of minor children; and (4) marital fault. *Bailey*, 254 B.R. at 906; *Luman v. Luman (In re Luman)*, 238 B.R. 697, 706 (Bankr.N.D.Ohio 1999) (citing *Singer v. Singer (In re Singer)*, 787 F.2d 1033, 1035 (6th Cir.1986)). Here, several of these secondary indicia of support are present: as previously noted, there is a significant disparity in the parties' income; Dorothy has the need for economic support and stability, and she has a minor child at home. But these factors were apparently weighed and found wanting by the state court when it specifically determined that Dorothy was not entitled to support.

Nor is Dorothy's argument that the Mortgage Obligation was not designated as support for tax reasons compelling. It simply strains credulity to suggest that the addition of $2400 per year to an annual income of $17,000 would have such a substantial tax impact as to drive a decision not to label the Mortgage Obligation a support payment.[2]

**2.** Several courts have held that a debtor who has classified payments to a former spouse as alimony on income tax returns is precluded by the doctrine of "quasi-estoppel" from subsequently claiming in bankruptcy proceedings that these payments are something other than alimony. *See Robb–Fulton v. Robb (In re Robb)*, 23 F.3d 895, 898 (4th Cir.1994); *Davidson v. Davidson (In re Davidson)*, 947 F.2d 1294, 1297 (5th Cir.1991); *Chance v. White (In re White)*, 265 B.R. 547, 554–55 (Bankr.N.D.Tex.2001). Other courts have declined to adopt a per se application of the quasi-estoppel doctrine, finding instead that the parties' characterization of a transaction on their tax returns is probative of their intent, but not outcome determinative in dischargeability litigation. *See Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 724–25 & n. 6 (10th Cir.1993); *Kritt v. Kritt (In re Kritt)*, 190 B.R. 382, 388–89 (9th Cir. BAP 1995).

It appears that a similar estoppel argument could have been asserted against Dorothy. She conceded that the Mortgage Obligation was not characterized as a support obligation so that the monthly payments received from the Debtor would not constitute taxable income. Under the quasi-estoppel doctrine, this characterization for tax purposes would preclude Dorothy from taking the position she has here—that the Mortgage Obligation is in reality a disguised support obligation excepted from discharge by § 523(a)(5)(B). The Debtor did not raise this issue, perhaps because he has not made a single payment on the Mortgage Obligation since the Divorce Decree was entered and, thus, Dorothy has received no tax benefit from the parties' characterization of the Mortgage Obligation.

In sum, while the Mortgage Obligation does indeed have some of the indicia of support identified in *Sorah* and *Bailey*, the Court concludes that the presence of these factors does not warrant a finding that the Mortgage Obligation constitutes nondischargeable support. To hold that the Mortgage Obligation is nondischargeable under § 523(a)(5) would turn a blind eye to the State Court's express finding that Dorothy is not entitled to support under Ohio law and a deaf ear to the Sixth Circuit's oft-repeated admonition to bankruptcy courts that state court divorce decrees must be accorded due deference.

In *Bullock v. Hodge (In re Hodge)*, 265 B.R. 908 (Bankr.N.D.Ohio 2001), the bankruptcy court reached the same conclusion on similar facts. There, the debtor filed bankruptcy after a divorce in which he was ordered to pay a jointly incurred marital debt. *Id.* at 909. Under the divorce decree, the parties expressly waived any claim against each other for spousal support. *Id.* at 910. The debtor's former wife filed a dischargeability complaint, alleging that the debtor's assumption of the debt was in the nature of support and thus nondischargeable under § 523(a)(5). The *Hodge* court ruled that:

> [G]iven the admonition in *In re Sorah* that a bankruptcy court should not second-guess state court support obligations, [the Court] can see no reason why the tenets set forth in *In re Sorah* should not be equally applicable to the situation where, as in this case, it was specifically stated that no alimony would be awarded to either Party. Stated in more precise legal terms, when a divorce decree or separation agreement holds that no spousal support shall be awarded to either party, any obligations contained therein should be viewed as a property settlement—and thereby subject to 11 U.S.C. § 523(a)(15)—unless it can be clearly and unequivocally shown

by the context of the divorce decree or separation agreement that it was the intent to create a support obligation.

*Hodge*, 265 B.R. at 912. *See also Findley v. Findley (In re Findley)*, 245 B.R. 526, 528 (Bankr.N.D.Ohio 2000) (concluding that debtor-husband's hold harmless obligation was not excepted from discharge under § 523(a)(5) where state court divorce decree provided that neither spouse was obligated to pay spousal support and noting that "[u]nder recent Sixth Circuit authority ... the court is constrained to give substantial weight to the characterization of the financial arrangement ... made by the parties and the domestic relations court").

As in *Hodge*, the record made at trial here fails to establish clearly and unequivocally that the parties intended to create a support obligation. To the contrary, the statement in the Magistrate's decision that Dorothy is not entitled to support under Ohio law could not be clearer. In view of this express language, it would be inappropriate for the Court to "assume the role of psychological examiner, probing the state court's decision for linguistic evidence of ulterior motives." *Sorah*, 163 F.3d at 402. Thus, the Court concludes that the Mortgage Obligation is not excepted from discharge by § 523(a)(5).

**B. Section 523(a)(15)—Dischargeability of Marital Obligations That Are Not Alimony, Maintenance, or Support**

"In 1994, Congress expanded the exception to discharge for marital obligations by adding § 523(a)(15) to the Bankruptcy Code." *Hart v. Molino (In re Molino)*, 225 B.R. 904, 907 (6th Cir. BAP 1998). Section 523(a)(15) excepts from discharge those marital obligations that are not alimony, maintenance, or support obli-

gations covered by § 523(a)(5).[3] Such obligations generally take the form of debt assumption or a property settlement obligation. Section 523(a)(15) provides that a debtor may not discharge a debt:

> not of the kind described in [§ 523(a)(5)] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless –
>
>> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or
>>
>> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15). Hence, under the statute, discharge of a marital obligation arising from a divorce decree or separation agreement is permitted if the debtor is either unable to pay the obligation or the harm to the debtor resulting from its pay-ment outweighs the benefit to the nondebtor spouse. *See Jodoin v. Samayoa (In re Jodoin)*, 209 B.R. 132, 139 nn. 17 & 18 (9th Cir. BAP 1997).

### 1. *Burden of Proof*

 The objecting creditor bears the burden of establishing that the debt is of a type excepted from discharge under § 523(a)(15). *Molino*, 225 B.R. at 907. Once this threshold showing has been made, the burden of proving the applicability of one of the two grounds for discharge listed above shifts to the debtor. *See Gamble v. Gamble (In re Gamble)*, 143 F.3d 223, 226 (5th Cir.1998); *Adams v. Adams (In re Adams)*, 241 B.R. 880, 882 (Bankr.N.D.Ohio 1999); *Newcomb v. Miley (In re Miley)*, 228 B.R. 651, 656 (Bankr.N.D.Ohio 1998); *Melton v. Melton (In re Melton)*; 228 B.R. 641, 645 (Bankr. N.D.Ohio 1998); *Molino*, 225 B.R. at 907; *Dunn v. Dunn (In re Dunn)*, 225 B.R. 393, 399 (Bankr.S.D.Ohio 1998) (Hopkins, J.). The debtor must make this showing by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Here, Dorothy has shown that the Mortgage Obligation is a debt incurred in connection with a separation agreement or divorce decree. The provision requiring the Debtor to pay one-half of each month's payment to Dorothy is contained in Section I–14–F of the Magistrate's Decision and in Paragraph 17 of the Divorce Decree. *See* Joint Exhibits I and III. Be-

---

**3.** Subsection (15) of § 523(a) was added to the Bankruptcy Code in the Bankruptcy Reform Act of 1994 to expand the § 523(a)(5) exception to discharge for marital debts. The legislative history of this provision reflects Congress's protective stance toward a debtor's former spouse and children:

> This section is intended to provide greater protection for alimony, maintenance, and support obligations owing to a spouse, former spouse or child of a debtor in bank-ruptcy. The Committee believes that a debtor should not use the protection of a bankruptcy filing in order to avoid legitimate marital and child support obligations. H.R.Rep. No. 103–835 at 54 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3363. *See generally* Bernice B. Donald & Jennie D. Latta, *The Dischargeability of Property Settlement and Hold Harmless Agreements in Bankruptcy: An Overview of § 523(a)(15)*, 31 Fam. L.Q. 409, 414–15 (1997).

cause Dorothy has made this showing, the Debtor must come forward with evidence establishing either his inability to pay the Mortgage Obligation or harm to him that outweighs the benefit to Dorothy if the debt is found to be nondischargeable.

### 2. *Ability to Pay*

■■■ Courts have taken a number of different approaches to determining ability to pay under § 523(a)(15). The majority of courts apply § 1325(b)(2)'s "disposable income test" in analyzing the ability to pay exception contained in § 523(a)(15).[4] *See Pino v. Pino (In re Pino)*, 268 B.R. 483, 497 (Bankr.W.D.Tex.2001) ("[M]ost courts rely on the 'disposable income test' of § 1325(b)(2) of the Bankruptcy Code because that section's language essentially mirrors the language [of] § 523(a)(15)(A).") (footnote omitted); *Cameron v. Cameron (In re Cameron)*, 243 B.R. 117, 122 (M.D.Ala.1999) (same). *See also Jodoin*, 209 B.R. at 142 ("[T]he 'disposable income test' that is delineated in Code § 1325(b) provides an excellent starting point for measuring a debtor's ability to pay under § 523(a)(15)(B)."); *Dunn*, 225 B.R. at 400 (utilizing § 1325(b)(2)'s disposable income test to assess ability to pay); *Barnes v. Barnes (In re Barnes)*, 218 B.R. 409, 411 (Bankr. S.D.Ohio 1998) (Sellers, J.) (same); *Carroll v. Carroll (In re Carroll)*, 187 B.R. 197, 200 (Bankr.S.D.Ohio 1995) (Calhoun, J.) (same). Other courts have applied the undue hardship test found in § 523(a)(8), *see Comisky v. Comisky (In re Comisky)*,

183 B.R. 883, 884 (Bankr.N.D.Cal.1995), or the totality of the circumstances test, *see Humiston v. Huddelston (In re Huddelston)*, 194 B.R. 681, 688–89 (Bankr.N.D.Ga. 1996). Still others review ability to pay on a case-by-case basis. *See Florio v. Florio (In re Florio)*, 187 B.R. 654, 657 (Bankr. W.D.Mo.1995). Since the statutory language of § 523(a)(15) and § 1325(b)(2) is virtually identical, the Court concludes that the disposable income test is the appropriate standard for measuring the Debtor's ability to pay the Mortgage Obligation.

■■■ Under the disposable income test, a marital obligation will be discharged under § 523(a)(15)(A) only if repaying it reduces a debtor's current income below the level reasonably needed for the support of the debtor or his or her dependents. *See Carroll*, 187 B.R. at 200. Only those expenses "reasonably necessary" for that support will be considered when calculating the ability of a debtor to pay the debt arising from a divorce decree or property settlement. Reasonably necessary expenses are those that are adequate, not first class or luxury items. *See In re Brooks*, 241 B.R. 184, 186 (Bankr.S.D.Ohio 1999) (Clark, J.); *Nelson v. Easley (In re Easley)*, 72 B.R. 948, 949 (Bankr. M.D.Tenn.1987). Thus, the court must review the Debtor's budget and determine whether he can afford payment of those reasonably necessary expenses plus the Mortgage Obligation. The court in *Arm-*

---

**4.** Section 1325(b)(2) defines "disposable income" as income:

which is received by the debtor and that is not reasonably necessary to be expended –
 (A) for the maintenance or support of the debtor or a dependent of the debtor including, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or

organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and
 (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2).

*strong v. Armstrong (In re Armstrong)*, 205 B.R. 386, 392 (Bankr.W.D.Tenn.1996) listed the following nine factors to be considered when determining a debtor's ability to pay under § 523(a)(15):

(1) debtor's "disposable income" as measured at the time of trial; (2) presence of more lucrative employment opportunities which might enable the debtor fully to satisfy his divorce-related obligation; (3) the extent to which the debtor's burden of debt will be lessened in the near term; (4) the extent to which the debtor previously has made a good faith effort towards satisfying the debt in question; (5) the amount of the debts which a creditor is seeking to have held nondischargeable and the repayment terms and conditions of those debts; (6) the value and nature of any property the debtor retained after his bankruptcy filing; (7) the amount of reasonable and necessary expenses which the debtor must incur for the support of the debtor, the debtor's dependents and the continuation, preservation and operation of the debtor's business, if any; (8) the income of the debtor's new spouse as such income should be included in the calculation of the debtor's disposable income; (9) any evidence of probable changes in debtor's expenses.

*See also Dunn*, 225 B.R. at 402 n. 9 (applying the nine factors enumerated by the *Armstrong* court); *Barnes*, 218 B.R. at 411 (same). Application of these factors demonstrates that the Debtor has failed to carry his burden of establishing an inability to pay the Mortgage Obligation.

The Debtor argues that his present income does not meet his current obligations and that he therefore is unable to pay the Mortgage Obligation. The Schedules I and J filed with his petition show monthly unemployment income of $1485 and expenses of $2,068 per month. The Sched-ules I and J prepared seven months later for trial purposes reflect expenses of $2,684 per month and an average monthly income of $2,343, leaving a deficit of $351. The discrepancy in income was explained at trial by the Debtor's testimony that his work as a union carpenter is seasonal and he generally has some period every winter where he draws unemployment benefits. But there was no explanation for the $617 per month increase in expenses between the filing of the petition and the time of trial (from the $2,068 per month listed on the Schedule J filed with the petition to the $2,684 listed on the Schedule J filed for purposes of trial). The items that changed in amount during this period are:

| | At Filing | At Trial |
|---|---|---|
| Electricity and Heating Fuel | $200 | $300 |
| Food | $300 | $350 |
| Clothing | 0 | $ 50 |
| Laundry & Dry Cleaning | 0 | $ 50 |
| Transportation (not including car payments) | $100 | $350 |
| Insurance—Health | 0 | $230 |
| Recreation, Clubs, Entertainment, etc. | 0 | $100 |
| Insurance—Auto | $100 | $ 60 |
| Installment Payments | | 0 |
| Dysinger & Stewart | $ 75 | — |
| St. Luke Parish Credit Union | $123 | — |
| Payments for Support of Dependents | $410 | $384 |
| Other: Son's College Expenses | 0 | $ 50 |

Under either version of the budget, the Debtor's lifestyle certainly is not lavish. But, upon careful examination of the revised budget, it does appear that the Debtor has sufficient disposable income to pay the Mortgage Obligation. Because no explanation was given for the increase in a number of the budget items, the Court is left to speculate whether the Schedules I and J prepared for trial were artificially inflated by the Debtor in order to produce a monthly deficit. It seems unlikely that utility bills would increase $100 per month from winter to summer, that transportation expenses would increase by $250 per month, that health insurance costs would suddenly increase from zero to $230 per month, or that the Debtor, who had no

recreation expenses at the time he filed his petition, would need $100 per month for recreation seven months later. In short, taking into account the Debtor's demeanor and the credibility of his trial testimony, the nature and amount of the increases in his scheduled expense items, and the Debtor's total failure to explain these increases, the Court concludes that some, if not all, of his expenses have been artificially inflated. If the Debtor were to divert $100 per month from recreation to the Mortgage Obligation, one-half of the debt would be satisfied. Modest reductions in transportation, food, and utility expenses would certainly free up the other $100. In addition, the Debtor testified that he needs a three-bedroom house in order to have sufficient space when his children visit. But the Debtor conceded that Lukas visits only sporadically and there was no testimony that he actually stayed overnight at the Debtor's house. No evidence was presented as to the cost or availability of smaller quarters in West Milton, Ohio. It does not appear, however, that the Debtor requires a three-bedroom house in order to support himself or his dependents. The Court thus concludes that the Debtor "has room to tighten his financial belt a few notches so that he may commence meaningful payments" on the Mortgage Obligation. *Brasslett v. Brasslett (In re Brasslett)*, 233 B.R. 177, 184 (Bankr.D.Me.1999).

The remaining *Armstrong* factors also weigh against a finding that the Debtor is unable to pay the Mortgage Obligation. The record is silent regarding the presence of more lucrative employment for the Debtor, although there appears to be no impediment to his finding alternative employment during seasonal layoffs. The Debtor has discharged all of his unsecured

debt (approximately $15,000), has surrendered vehicles for which he had previously scheduled some $200 in monthly payments, and has only minimal postpetition debt. Hence, his debt burden has been substantially reduced. The Debtor has made no effort whatsoever to pay the Mortgage Obligation: the testimony at trial was that Dorothy has made all payments on the mortgage since 1999. The Debtor retained approximately $2400 in personal property and $47,450 in retirement benefits after his bankruptcy filing. The Debtor has not remarried. Finally, no evidence was presented regarding any probable future changes in his expenses.

Based on this record, the Court determines that the Debtor has the ability to meet the $200 per month Mortgage Obligation from income not reasonably necessary to be expended for his support or that of his dependents. There is nothing to suggest that by repaying this obligation the Debtor will not be able to afford ordinary living expenses. *Dunn*, 225 B.R. at 400. The Mortgage Obligation therefore is not dischargeable under § 523(a)(15)(A).

### 3. *Balancing of Harm*

Section 523(a)(15)(B) provides the debtor with a second possible exception to nondischargeability of a marital debt—the balancing of harms test that permits discharge of a marital obligation if it "would result in a benefit to the debtor that outweighs the detrimental consequence to a spouse, former spouse, or child of the debtor." 11 U.S.C. § 523(a)(15)(B).

In its unpublished decision in *Patterson v. Patterson (In re Patterson)*, No. 96–6374, 1997 WL 745501 *3 (6th Cir. Nov.24, 1997),[5] the Sixth Circuit affirmed

---

5. "Although unpublished decisions of the Sixth Circuit are not binding precedent, they can be cited if persuasive, especially where

there are no published decisions which will serve as well." *Belfance v. Black River Petroleum, Inc. (In re Hess)*, 209 B.R. 79, 82 n. 3

the bankruptcy court's adoption of the non-exclusive list of eleven factors enumerated in *In re Smither*, 194 B.R. 102 (Bankr.W.D.Ky.1996) to guide its § 523(a)(15)(B) analysis. The eleven non-exclusive factors considered by the *Smither* court in applying § 523(a)(15)(B)'s balancing test are:

(1) The amount of debt involved, including all payment terms;

(2) The current income of the debtor, objecting creditor and their respective spouses;

(3) The current expenses of the debtor, objecting creditor and their respective spouses;

(4) The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses;

(5) The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses;

(6) The health, job skills, training, age and education of the debtor, objecting creditor and their respective spouses;

(7) The dependents of the debtor, objecting creditor and their respective spouses, their ages and any special needs which they may have;

(8) Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree;

(9) The amount of debt which has been or will be discharged in the debtor's bankruptcy;

(10) Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and

(11) Whether the parties have acted in good faith in the filing of the bank-

(6th Cir. BAP 1997) (citing *In re Braddy*, 195

ruptcy and the litigation of the 11 U.S.C. § 523(a)(15) issues.

*See Smither*, 194 B.R. at 111. *See also Armstrong*, 205 B.R. at 392.

■ As the *Smither* court noted:

The best way to apply the 11 U.S.C. §§ 523(a)(15)(B) balancing test is to review the financial status of the debtor and the creditor and compare their relative standards of living to determine the true benefit of the debtor's possible discharge against any hardship the spouse, former spouse and/or children would suffer as a result of the debtor's discharge. If, after making this analysis, the debtor's standard of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged under 11 U.S.C. §§ 523(a)(15)(B).

*Smither*, 194 B.R. at 111.

■ As discussed above, Dorothy has established that the Mortgage Obligation was imposed by the Divorce Decree. Thus, the Debtor bears the burden of proving by a preponderance of the evidence that the benefit to him of discharging the Mortgage Obligation outweighs the detrimental consequences to Dorothy. *Molino*, 225 B.R. at 907. Section 523(a)(15)(B)'s balancing test is applied below.

### a. *Amount of Debt Involved*

The current amount of the Mortgage Obligation is approximately $29,000. The Debtor is responsible for paying one-half,

B.R. 365, 370–71 (Bankr.E.D.Mich.1996)).

or roughly $14,500. This is a long-term obligation and his payments of $200 a month are not onerous.

### b. Current Income and Expenses

While the Debtor contributes $50 per month toward Lukas's college expenses and pays $384 a month in child support for Ann, it is undisputed that Dorothy bears the brunt of financially supporting both children. Both children lived with her until Lukas left for college; he now lives with Dorothy when not at college and Ann remains at home. As discussed above, Dorothy has taken loans from her 401(k) plan to pay Lukas's college expenses and has taken on the Truck Lease. In short, the Debtor is supporting one person (plus making monthly payments of $384 in child support and $50 in college expenses) on a yearly income of between $30,000 and $40,000. His monthly expenses total $2684. In contrast, Dorothy is supporting herself and two children on $17,000 per year, and reporting monthly expenses of $2864, or only $200 per month more than the Debtor.

### c. Current Assets

Each of the parties has $47,750 in retirement benefits. The Debtor lists $2400 in personal property. Dorothy lists $7800 in personal property, but she has included in this amount the $4500 in her 401(k) plan, which is already encompassed in the $47,750 retirement benefit figure referenced above. Subtracting that amount leaves her with personal property of $3300.

The only sizeable disparity in the parties' assets stems from Dorothy's ownership of the Property. The Property is listed as having a value of $92,000 and is encumbered by a mortgage of approximately $29,000, leaving equity of about $62,000. The Debtor owns no real estate. As previously discussed, Dorothy testified that she has not considered selling the Property because it has been in her family for many years. As the Magistrate's Decision noted, given her limited income, it would make more economic sense for Dorothy to retain the property than to sell it and be faced with mortgage or rent payments likely in excess of the amount she now pays. See Magistrate's Decision, Joint Exhibit I, at 5–6. Thus, while, on paper, Dorothy has more assets, the likelihood and practicality of liquidating the Property is small and the benefit to her of doing so would be negligible.

### d. Current Liabilities

The Debtor has current liabilities—for unpaid rent, utilities and automobile repairs—totaling approximately $1,900. Dorothy's liabilities include one-half of the approximately $29,000 Mortgage Obligation, the Truck Lease payment (no evidence was elicited as to the term of the Truck Lease) and possible medical expenses resulting from the automobile accident.

### e. Health, Job Skills, Training, Age and Education

Each party is in good health, although the Debtor suffers from allergies and back problems and Dorothy has had a period of disability caused by an automobile accident. There is no evidence that these health problems impact the earning capacity of either the Debtor or Dorothy. Their ages, education, job training, and job skills appear to be approximately the same.

### f. Dependents

The parties have two children, Ann and Lukas.

### g. Changes in Financial Condition Since the Divorce

There have been no changes in the financial condition of the parties since the divorce.

882

### h. *Amount of Debt to be Discharged*

The Debtor has discharged some $15,000 in unsecured debt.

### i. *Eligibility for Relief Under Bankruptcy Code*

Dorothy is eligible for bankruptcy relief, but there is nothing in the record indicating that she intends to file or that a filing would afford her much relief since, other than possible medical bills resulting from her automobile accident, Dorothy appears to have very little unsecured debt. Her only secured debts are the Loan and the Truck Lease.

### j. *Good Faith*

No evidence has been offered establishing that the Debtor has filed his bankruptcy case or conducted this litigation other than in good faith.

Taking all of the foregoing factors into account, the Court finds that the Debtor's standard of living if required to pay the $200 per month Mortgage Obligation will be equal to or better than Dorothy's. On the other hand, if the $200 Mortgage Obligation is discharged, Dorothy's already tenuous financial situation will worsen. The unrebutted evidence establishes that she is surviving under very difficult circumstances, primarily through hard work, fiscal discipline and help from her family. Her standard of living is already below that of the Debtor. Permitting the Debtor to discharge the Mortgage Obligation would only increase the disparity. In sum, the Debtor has not established by a preponderance of the evidence that a discharge of the Mortgage Obligation would result in benefit to him that outweighs the detrimental consequences to Dorothy.

### V. *Conclusion*

For the foregoing reasons, the Court finds that the Mortgage Obligation is not in the nature of alimony, maintenance, or support, and thus is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(5). The Court further finds that the Mortgage Obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(15)(A) and (B). A judgment in accordance with this Memorandum Opinion will be entered separately.

**IT IS SO ORDERED.**